# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

AUSTIN HARDWARE & SUPPLY INC.,

                Plaintiff,

v.

ALLEGIS CORPORATION,

                Defendant.

Case No. 19-CV-785-JPS

**ORDER**

This is a patent case about drawers—the furniture kind. The parties, both hardware companies, are developers of a drawer-release system that allows individuals to open, lock, and close drawers with one hand. The plaintiff, Austin Hardware & Supply Inc. ("Austin") holds two of the patents at issue for the drawer-release system. The defendant, Allegis Corporation ("Allegis") is accused of infringing the patents. The parties have filed cross-motions for summary judgment, which are fully briefed. (Docket #44, #50). For the reasons explained below, Austin's motion will be granted in part and Allegis's motion will be denied.

The parties have also filed various unopposed motions to restrict submissions (Docket #51, #62, #82, #84, #94), on the grounds that the documents divulge confidential information that is covered by the protective order. The Court will grant these motions. Pursuant to the terms of the protective order, the parties have also filed redacted, non-confidential versions of those documents.

Additionally, Austin filed a motion to strike Allegis's amended expert report. (Docket #93). Allegis's expert, Bradley J. Thorson

("Thorson"), initially drafted an expert report in which he stated that persons of ordinary skill in the art should have at least three years of experience designing mechanical hardware or associated components, or five years of education or experience in design, construction, modification, or fabrication of mechanical hardware or associated components. *See* (Docket #95-2 at 13). Mr. Thorson subsequently amended his expert report to explain that this experience is required only if the person lacks a bachelor's degree in the relevant field. (Docket #95-8 at 2, 9). At the time the amended report was submitted, the parties had yet to complete discovery, had not taken expert depositions, and had not filed *Daubert* motions. The Court finds that the amended report was proper, and will deny Austin's motion to strike.

1.     FACTUAL BACKGROUND

     1.1     The Device

     The disputed drawer release system allows users to open a drawer, lock it into place, unlock it, and close it—all with one hand. The method is particularly useful to users who open and close drawers on trucks, which may be parked at an angle, making it difficult to keep drawers open or closed. The products use a handle that runs the width of a drawer, which can be pulled up to open the drawer. This upward-lifting motion prompts a rotating mechanism that facilitates the drawer slides opening, locking, and closing.

     Austin's drawer release system ("DRS") is covered by two patents, which will be described Section 2, below. Allegis developed the accused product ("AP") that is the subject of this litigation. Whether Allegis's AP infringes Austin's patents depends, in large part, in how the patent claims

are constructed. These will be subject to greater discussion, below. At this juncture, it suffices to provide a broad overview of the dispute.

The main contention is over the definition of the term "handle portion." Allegis seeks a narrow definition, which defines "handle" as simply the metal part of the device that is pulled up. Allegis's definition excludes the handle caps—the black plastic components that connect either end of the metal handle to the black, stationary portions of the release system that affix to the drawer itself (also known as the "fixed portion" of the drawer release system). Austin, by contrast, contends that the handle portion includes the handle caps and cams. This distinction is important because the claims specify that the opening, locking, and closing mechanisms are part of the "handle portion" of the device. In order to avoid infringement, Allegis argues that the opening, locking, and closing mechanisms of the AP are part of the "fixed portion" of the device, which is separate from the handle portion. The distinction is best illustrated by the parties' competing diagrams.

Allegis claims the handle consists solely of the single metal piece in the device, distinct from the handle cap:



Whereas Austin claims that the handle portion consists of the metal piece *and* the handle caps and cams.



Such that the handle portion consists of the following components:



In addition to construing "handle portion," the parties also seek construction of the terms "axis" and "lever engaging member," with similar end goals. For example, Allegis seeks a philosophical definition of "axis" that renders the claim difficult to apply, whereas Austin seeks general and broadly applicable definition of "axis" that would include the AP's spline, which connects the handle cap to the handle cam. Similarly, Allegis seeks a narrow definition of the term "lever engaging member," based in part on the argument that it is a means-plus-function term that must only cover the pins used in Austin's embodiment of the DRS. By contrast, Austin seeks a

broad definition of the term, one that would cover the AP's handle cam. Other terms that bear on the outcome of the dispute will be constructed in turn, in Section 2, below.

### 1.2 The Patents

Austin's drawer release mechanism is covered by two patents: U.S. Patent No. 10,004,331 patent (the "'331 Patent") and U.S. Patent No. 10,455,937 (the "'937 Patent"). The claims at issue in the '331 Patent are Claim 26, an independent claim, and Claims 27–30, which are dependent on Claim 26. The claims at issue in the '937 Patent consist of Claims 14 and 21, which are both independent.

The '331 Patent was issued on June 26, 2018. The '937 Patent was issued on October 29, 2019. These patents are part of the same "patent family," which is to say that their descriptions and specifications are the same. Austin apprised Allegis of each patent application before and after it was approved. As early as 2015, Allegis became aware that the '331 Patent was in the works, and began conferring with a patent attorney, Edwin Voigt, in order to avoid infringement. On several occasions, Allegis altered the design of the AP in order to avoid infringement. In January 2019, Allegis began selling its AP. On April 2019, Austin sent Allegis a cease-and-desist letter warning that the AP infringed the '331 Patent.

Claim 26 of the '331 Patent consists of the following elements:

A method of opening a drawer, comprising:

providing a drawer release comprising a handle portion pivotally engaged to a fixed portion, wherein the handle portion comprises an axis having an axis surface, and the axis rotates in a curved portion of the fixed portion, and the axis surface rotates against an inner curved surface of the curved portion and the handle portion comprising at least one lever engaging member that engages a lever of a drawer slide,

the drawer engaged to the drawer slide to provide a sliding movement to the drawer, the drawer slide having a latch or a lock that prevents the sliding movement of the drawer, the lever is integral with the latch or the lock and is moveable to release the latch or the lock of the drawer slide and allow the sliding movement of the drawer;

pulling on the handle portion to pivot the handle portion relative to the fixed portion;

causing the at least one lever engaging member to move generally downward to engage the lever of the drawer slide; and

releasing the latch or the lock on the drawer slide to unlatch or unlock the drawer slide to allow the sliding movement of the drawer.

Claims 27–30, which are dependent from Claim 26, read as follows:

27. The method according to claim 26, further comprising pulling on the handle portion to slide the drawer open, wherein the drawer slides open via the drawer-slide.

28. The method according to claim 26, further comprising pulling on any portion of the handle portion to open the drawer.

29. The method according to claim 26, wherein the at least one lever engaging member comprises at least two lever engaging members and further causing the two lever engaging members to move substantially downward to engage the lever and an additional lever.

30. The method according to claim 26, further comprising causing the at least one lever engaging member to move downward to engage the lever, while simultaneously causing a second lever engaging member to move downward to engage a second lever.

Claim 14 of the '937 Patent consists of the following elements:

A release for a drawer slide, comprising:

a handle portion pivotally engaged to a fixed portion to move between open and closed positions, wherein the

handle portion comprises an axis, and the axis rotates in a curved portion of the fixed portion;

a spring assembly biases the handle portion to the closed position;

a drawer slide, the drawer slide comprising an outer member and an inner member, the inner member slides relative to the outer member to provide a sliding movement to the drawer slide, the drawer slide having a lock that prevents the sliding movement of the drawer slide, the drawer slide having a lever rotably mounted to the drawer slide, wherein the lever is moveable to release the lock of the drawer slide and allow the sliding movement of the drawer slide; and

at least one engaging member that extends from the handle portion and the at least one engaging member engages an upper surface of the lever of the drawer slide of the drawer to open or release the lock to allow the sliding movement of the drawer slide, and wherein a pulling motion applied to the handle portion moves the handle to the open position and causes the at least one engaging member to move in a substantially downward direction to press down on the upper surface of the lever to open or release the lock of the drawer slide.

Claim 21 of the '937 Patent contains the following elements:

A drawer assembly with a release, comprising:
a drawer;

a drawer release comprising a handle pivotally engaged to a fixed portion to move between open and closed positions;

the fixed portion attached to or connected to the drawer;

the handle portion extends an entire width or substantially the entire width of the drawer;

a spring assembly biases the handle portion to the closed position;

the drawer engaged to a drawer slide, the drawer slide comprising an outer member and an inner member, the inner member attached to the drawer, the inner member slides relative to the outer member to provide a sliding movement to the drawer slide, the drawer slide having a lock that prevents the sliding movement of the drawer slide, the drawer slide having a lever rotatably mounted to the drawer slide, wherein the lever is moveable to release the lock of the drawer slide and allow the sliding movement of the drawer slide; and,

the handle portion comprising at least one engaging member, and the at least one engaging member engages a surface of the lever of the drawer slide of the drawer to open or release the lock to allow the sliding movement of the drawer slide, and wherein a pulling motion applied to the handle portion causes the at least one engaging member to move in a substantially vertical direction to press against the surface of the lever to open or release the lock of the drawer slide.

## 2. CLAIM CONSTRUCTION

Claim construction requires the Court to determine the meaning and scope of the disputed claim terms. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). The interpretation of patent claims is a question of law for the Court. *Id.* To construe a given claim, "the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). First in importance is the language of the claim itself as allowed by the examiner. *Bell Comm. Research, Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995).

The words of a claim are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."

Case 2:19-cv-00785-JPS   Filed 09/29/20   Page 8 of 39   Document 97

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Tethering construction to a person of ordinary skill in the art is critical, teaches the Federal Circuit, because such a person reads the words of the claims against the context of their meaning in the relevant field of study, including any special meanings or usages, and in light of closely related documents such as the specification and the prosecution history. *Id.* at 1313. Because specialized meanings can be attributed to terms based on the field in question, general-purpose dictionaries are not always useful. *See id.* Before resorting to such a resource, courts should begin with the materials that a person of skill in the art would use: "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (citations and quotations omitted).

After evaluating the claim language itself, the Federal Circuit instructs that the specification "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Although the patent specification may not be used to rewrite the claim language, *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004), the specification may be used to interpret what the patent holder meant by a word or phrase in the claim, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

After considering the claim language and the specification, a court may consult the final piece of intrinsic evidence: the patent's prosecution history. *Vitronics*, 90 F.3d at 1582. "[S]tatements made during the prosecution of a patent may affect the scope of the invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001). This is especially true

if a particular interpretation of the claim was considered and specifically disclaimed during the prosecution of the patent. *Vitronics*, 90 F.3d at 1582–83.

Generally, the body of intrinsic evidence will eliminate any ambiguity in the claim terms, rendering unnecessary any reference to extrinsic evidence. *Id.* at 1583. Yet, if needed, a court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19. Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works, but it may not be used in derogation of the intrinsic evidence. *Id.*

### 2.1 "Handle portion," "fixed portion," "axis," and "pivotally engaged"[1]

Claim 26 covers "[a] drawer assembly with a release," which comprises, among other things, "a *handle portion* pivotally engaged to a *fixed portion*, . . . wherein the *handle portion comprises an axis* having an axis surface, and *the axis* rotates in a curved portion of the fixed portion, and the axis surface rotates against an inner curved surface of the curved portion."

---

[1]Although Allegis initially claimed that it only sought construction of "lever engaging member," over the course of summary judgment, the terms "curved portion," "inner curved surface [of the curved portion]," "axis surface," and "open and closed positions [of the handle portion]" were each called into question. However, none of these terms are material to understanding the claim, nor are they dispositive of the motions for summary judgment. Courts should only construe the terms that are actually in dispute, and "only to the extent necessary to resolve" the dispute. *Vivid Tech., Inc. v. Am. Sci. & Eng'ring, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Therefore, the Court will not construe these terms.

(Docket #55-1 at 24) (emphasis added). The terms "handle portion," "fixed portion," "axis," and "pivotally engaged" are discussed below.

| Term at issue | Austin's Proposed Construction | Allegis's Proposed Construction |
|---|---|---|
| handle portion | "portion that serves as a handle" | "that portion of the drawer release which forms the axis and is pulled by an operator" |
| fixed portion | "portion that is fixed/attached to the drawer" | "non-moving part of the drawer-release to which the handle is hinged" |
| axis | "an imaginary line around which the handle portion rotates" (Docket #63 at #20). | "the part of the handle that provides a contact surface for handle rotation" |
| pivotally engaged | "engaged to allow for pivoting" | "that forms a hinge with" |

There is a "heavy presumption" that a patent claim "carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (7th Cir. 2002) (citations and quotations omitted). Absent an instructive limitation in the claim itself, the Court will generally "construe the term to cover all known types of that structure that the patent disclosure supports." *Id.* (citations and quotations omitted). While technical treatises and dictionaries are best used only if internal evidence does not shed light on a claim's meaning, *see Vitronics*, 90 F.3d at 1584 n.6, general dictionaries may be useful if "the ordinary meaning of claim language as understood by

Case 2:19-cv-00785-JPS   Filed 09/29/20   Page 11 of 39   Document 97

a person of skill in the art may be readily apparent even to lay judges," such that "claim construction. . . involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

Once the ordinary meaning is established, the Court will only narrow a term's definition from the ordinary meaning if (1) the patentee "clearly set forth a definition of the disputed claim term in either the specification or prosecution history;" (2) "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment;" (3) if the meaning "chosen by the patentee so deprives the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning;" or (4), pursuant to 35 U.S.C. § 112, "if the patentee phrased the claim in a step- or means-plus-function format." *CCS Fitness, Inc.*, 288 F.3d at 1365–67 (internal quotations omitted).

Notwithstanding the length of the briefs and the *five* claim construction charts submitted to the Court, there is not a substantial difference between the parties' proposed definitions of "handle portion." The distinction is in what the parties understand these words to mean: Austin understands "handle portion" to include the handle caps and lever-engaging members (more on those below), while Allegis understands "handle" to mean, simply, the extrusion touched by the user. The Court finds that Austin's construction is more consistent with the claim language.

The term "handle" must be read with reference to its modifier, "portion," as well as with reference to the corollary "fixed portion" of the drawer release system. Bearing the modifier and corollary in mind, the "handle portion" clearly includes the piece of metal grasped by the user, as well as that portion of the device that is not necessarily grasped by the user,

Case 2:19-cv-00785-JPS   Filed 09/29/20   Page 12 of 39   Document 97

but is nonetheless part of the handle (i.e., functional or ornamental components). This is distinct from that portion of the drawer release system that is affixed to the drawer itself, i.e., the "fixed portion," which hosts the handle portion. Thus, the "handle portion" includes all components that facilitate the movement of the drawer, while the fixed portion holds the handle portion to the drawer itself. Accordingly, the "handle portion" includes the handle caps at the end of the metal extrusion, as well as the handle cams. Thus, the "handle portion" shall mean "the portion of the device that serves as a handle," inclusive of components that assist in this function. Relatedly, the "fixed portion" shall mean, "the portion of the device that is fixed/attached to the drawer."

In terms of the definition of "axis," Allegis takes issue with the fact that Austin used the word "imaginary" to define the axis. Allegis contends that such a theoretical definition is unworkable, and instead identified one of the DRS embodiments' screws as the axis point. (There is no similar screw in the AP). The specifications explain that "[t]he handle portion. . . is hingedly or pivotally engaged to the fixed portion." *See* (Docket #55-1 at 18.) "The handle extrusion includes an axis that provides an axis of rotation for the handle extrusion. An axis surface of the axis rotates around the inner curved surface of the fixed extrusion." (*Id.* at 20). "As the handle extrusion is pulled by the operator, the axis rotates within the curved portion." (*Id.* at 21). This language does not provide significant insight into what "axis" means, but it is clear that it encompasses more than a screw.

Since the language of the claim, the specifications, and the patent history do not assist in a firm construction of the term "axis," the Court turns to extrinsic evidence. As Allegis's expert has admitted, "all handles have axis," and even "the Allegis system has an axis which it rotates about,

in the broadest sense." (Docket #55-21 at 122:21–123:8). Indeed, the New Oxford American Dictionary describes "axis" as "an imaginary line about which a body rotates," while Merriam Webster defines it as "a straight line around which a body or a geometric figure rotates or may be supposed to rotate." *Compare* New Oxford American Dictionary (3d ed.) *with* Merriam Webster, *merriam-webster.com/dictionary/axis* (last accessed September 28, 2020). In both definitions, the axis serves as a fixed line relative to a body's rotation. By the claim's language, then, the axis serves as the point around which the handle rotates.

In order to avoid the metaphysical can of worms invoked by the New Oxford American Dictionary's use of the term "imaginary" while still recognizing the meaning of the term that is consistent with the claim's language, the Court will adopt the Merriam Webster definition of the term "axis," i.e., "a straight line around which a body . . . rotates." *Id.* There is nothing in the context of the claim that requires another definition. In light of this definition, the axis will feature any piece that contains the line around which the handle rotates.

Finally, the term "pivotally engaged" can be understood with reference to its ordinary meaning, i.e., "engaged to allow for pivoting." A pivot might mean any kind of turn or rotation; it is not limited to a hinge by either the plain language of the term or the claim's limitations. Indeed, the claim specifies that the handle portion is "hingedly *or* pivotally engaged," thereby indicating that "pivotally" should not be narrowed to mean only "hingedly." Accordingly, the Court will not narrow the definition. *CCS Fitness, Inc.*, 288 F.3d at 1365.

Case 2:19-cv-00785-JPS   Filed 09/29/20   Page 14 of 39   Document 97

## 2.2 "Lever engaging member" / "Engaging member"

The parties also dispute the term "lever engaging member." Allegis claims this is a means-plus-function term, which, pursuant to 35 U.S.C. § 112 requires that it be limited to "the corresponding structure or step disclosed in the specification, as well as equivalents thereto." *CCS Fitness, Inc.*, 288 F.3d at 1367. Specifically, § 112(f) explains, "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f). In order to trigger the rebuttable presumption that this subsection applies to a claim, the claim must actually use the word "means." *CCS Fitness, Inc.*, 288 F.3d at 1369. Otherwise, there is a rebuttable presumption that § 112(f) does not apply. *Id.*

In *CCS Fitness, Inc.*, which dealt with a patent for a device used in a stationary exercise machine, the Federal Circuit evaluated the term "reciprocating member" to evaluate whether it covered "more than the single-component, straight-bar structures (and their equivalents) shown in the patents' drawings," such that it would *also* apply to a multi-component curved member that functionally operated the same way. 288 F.3d at 1369. The Federal Circuit determined that the accused infringer had not sufficiently overcome the presumption against § 112(f), and also noted that the claims sufficiently recited a physical structure that avoided the provision. *Id.* at 1369–70.

Allegis advances the argument that "member" is a "nonce term" or a term that "do[es] not connote sufficiently definite structure," such that it operates the same way that the word "means" does, thereby giving rise to

the presumption that § 112(f) applies. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015). Allegis further contends that, since the embodiment drawing uses a pin, the term "lever engaging member" must be narrowed to mean "pin."

Given the caselaw to the contrary, the Court is disinclined to find that "member" is a nonce word. *See e.g.*, *CCS Fitness, Inc.*, 288 F.3d at 1369–70; *Lear Corp. v. NHK Seating of Am., Inc.*, Case No. 13-cv-12937-LJM-RGW, 2018 WL 3615000, at *12 (E.D. Mich. Apr. 23, 2018) (relying on definition in Oxford Dictionary of Current Usage); *Boston Sci. Corp.*, No. 15-980-LPS-CJB, 2017 WL 1364205, at *3–4 (D. Del. Apr. 12, 2017) (same). Indeed, the New Oxford American Dictionary defines "member" as "a constituent piece of a complex structure." New American Oxford Dictionary (3d ed.). In other words, it is a specific part in a structure—by its definition, not a nonce word. Therefore, there is not a rebuttable presumption that § 112(f) applies—rather, there is a presumption that § 112(f) does *not* apply. *CCS Fitness, Inc.*, 288 F.3d at 1369.

Allegis has not rebutted the presumption against § 112(f). To begin with, the argument that the terms "pin or lever engaging member" must be narrowed to mean only "pin" would render the "lever engaging member" language meaningless. This runs contrary to that which counsels "claims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). The '331 Patent specifies that a pin *or* another lever-engaging member (such as a piece of plastic, as the case may be) may be used to depress the levers. This language is consistent with the other terms of the patent, some of which specifically require only a pin. *See e.g.*, (Docket #55-1 at 25) ('331 Patent requiring "at least one engaging member in the form of a cylindrical pin.");

*see also CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

More to the point, the term "lever-engaging member" is sufficiently structural to avoid application of § 112(f). The claim describes the "engaging member" as existing on "opposite sides of the handle portion or extrusion" that is "moved by the handle portion or the handle extrusion" to "contact the levers or triggers" and press them down. (Docket #55-1 at 18). In effect, the lever-engaging member describes another set of levers that press upon the locking/unlocking drawer levers.[2] Accordingly, the Court adopts Austin's term for "lever engaging member," i.e., "structure that engages a lever, actuator, or trigger."

### 2.3    "Spring assembly"

Neither party moved to construct "spring assembly" in their briefing. Allegis addressed the lack of infringement of the '937 Patent as to the spring assembly in its own moving brief, but did not suggest, at that juncture, that the term required construction. *See* (Docket #45 at 22–23, 26–27) (discussing lack of infringement with regard to spring assembly). Indeed, it did not become an issue until Allegis opposed Austin's motion for summary judgment, and advanced the argument that "spring assembly" should be construed to include not just a spring that guides the

---

[2]Even if the Court were to understand the "lever engaging member" to be a means-plus-function term, Section 112(f) provides that the claim would nevertheless cover "the corresponding structure, material, or acts described in the specification, *and equivalents thereof*." By the terms of the claim, this would include pins and non-pin alternatives—there is no reason to limit this term exclusively to "pins."

handle portion closed, but also a spring guide, a spring guide base, and a spring guide opening, as suggested by unasserted Claim 15. (Docket #69 at 24–25). In its reply, Austin countered that Claim 15, which depends from Claim 14, is narrower than Claim 14, and contains limitations including the spring guide. Austin defined "spring assembly" as, "to be met by a spring." Thus, the competing constructions are:

| Term at issue | Austin's proposed construction | Allegis's proposed construction |
|---|---|---|
| spring assembly | "to be met by a spring" | "spring that guides the handle portion closed, but also a spring guide, a spring guide base, and a spring guide opening" |

As a general matter, the Court need only construe "those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Tech., Inc. v. Am. Sci. & Eng'ring, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). In this situation, the term "spring assembly" is necessary to determine whether Claims 14 and 21 have been directly infringed. If, as Austin argues, a spring assembly can consist of solely a spring that assembles other components in the device, then there would be no infringement. If, however, Allegis is correct that the term "spring assembly" carries the definition advanced in Claim 15, then there is no direct infringement, because the AP lacks a spring guide, base, and opening.

The Court begins with the plain language of the term "assembly," which modifies "spring." According the New Oxford American Dictionary, "assembly," as a modifier, means either "the action of fitting together the component parts of a machine or other object" or "a unit consisting of

components that have been fitted together." New Oxford American Dictionary (3d ed.). Thus, by definition of the term "assembly," a "spring assembly" requires the spring to fit together component parts. The question, then, is whether the "spring assembly" in Claim 14 consists of a spring that assembles other components of the device, as Austin would argue, or whether the "spring assembly" must consist of the spring *and other* spring components that, together, form an assembly that is used in the device—as Allegis would contend.

Claims 14 and 21 each provide that, "a spring assembly biases the handle portion to the closed position." (Docket #55-2 at 23). The specification explains, "[a] variety of spring biasing members may be used with the drawer release." (*Id.* at 20) (numeric annotations omitted). It describes Figure 9A, which features "extension springs [that] are connected to the end caps. The extension springs biases the handle extrusion in a closed position. The extension springs may connect directly to the first pin or the second pin, respectively. Or, the extension springs may connect to [the] handle extrusion or to the rear portion of the handle extrusion." (*Id.* at 20) (numeric annotations omitted). Relatedly, in Figure 9B, "a leaf spring is shown. The leaf spring connects to a handle extension to bias the handle extrusion in a closed position. When the handle extrusion is pulled, the bias of the leaf spring is overcome to allow the pins . . . to move downward." *Id.* (numeric annotations omitted). Figures 9A and 9B, in turn, feature two types of springs, which are assembled to connect to the handle portion and fixed portion. Neither specification, nor embodiment, refer to spring guides, a spring guide base, or a spring guide opening, lending support to the position that "spring assembly" refers to a single spring that assembles the handle portion into a closed position.

Case 2:19-cv-00785-JPS   Filed 09/29/20   Page 19 of 39   Document 97

The Court now turns to the limitation in Claim 15, which is dependent from Claim 14, and which provides that a "claim assembly" includes a spring guide, spring guide base, and spring guide opening. The claim construction cannon of claim differentiation counsels that, "dependent claims are presumed to be of narrower scope than the independent claims from which they depend." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) "[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *see also* 35 U.S.C. § 112(d) ("[A] claim in dependent form *shall* contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.") (emphasis added). However, "claim differentiation is a rebuttable presumption that may be overcome by a contrary construction dictated by the written description or prosecution history." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1324 (Fed. Cir. 2016).

This canon prompts a construction of "spring assembly" for Claim 14 that is *broader than* the spring assembly set forth in Claim 15. Claim 15 requires a spring assembly that is more granular and specified than that in Claim 14—the spring assembly provided in Claim 14 would thus be *inclusive* of the spring assembly detailed in Claim 15. The Court is aware that Claim 15 specifies more parts than Claim 14, and thus could be considered, at least in one respect, to be broader than Claim 14. However, this interpretation is not supported by the specifications, which do not seem to require the spring assembly to include a base, guides, or opening. Thus, the presumption that Claim 14 is broader than Claim 15 is unrebutted, and includes, but does not require, the spring guide, spring guide base, and

spring guide opening that Allegis's construction requires. The Court will therefore adopt the following construction: a "spring assembly" is "a spring that assembles the handle portion into a closed position."

3.      **SUMMARY JUDGMENT**

Now that the Court has construed the disputed claim terms, it turns to the parties' motions for summary judgment. Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3.1     **Direct Infringement of the '331 Patent**

"[A] literal infringement issue is properly decided upon summary judgment when no genuine issue of material fact exists, in particular, when

no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). As Section 1 detailed, there are eleven limitations involved in Claim 26. The discussion below will demonstrate how each limitation is met by the AP.

First, the AP is undisputedly a method of opening a drawer. The AP's handle portion consists of a metal extrusion, as well as handle caps and cams connected via spline, which forms the handle's axis. The handle portion of the AP is pivotally engaged to the fixed portion of the device— i.e., the handle caps and cams are attached to the "end caps," which are affixed to the front of the drawer. When the handle caps are rotated (i.e., when the handle is pulled), so too rotate the handle cams, which turn in the holes of the fixed portion. (Docket #55-15 at 39:3–24). The AP's handle portion comprises an axis and axis surface—the handle caps, spline, and cams—which rotate when the handle is pulled. The axis spline rotates against an inner curved surface of the fixed portion. (*Id.* at 43:8–25) (describing the hole in which the spline rotates); *see also* (Docket #80 at 26) (demonstrating wear marks on axis, in this case, a spline, from contact with the curved surface).

The AP's handle portion includes a lever engaging member that functions to depress the latch or lock as the handle is pulled or released. In the AP, the handle cam serves as the lever-engaging member. Consistent with its proposed construction of "handle portion," Allegis argues that the patent requires the lever-engaging member to be in the *handle*, whereas the AP has the lever in the handle's end-cap—which, Allegis contends, is part of the "fixed" portion of the device. However, as discussed above, the claim's language supports a construction that the "handle portion" includes

the handle's caps and cams that rotate *with* the handle when pulled. The *end* caps—not to be confused with the *handle* end caps—make up the fixed portion of the device, which is affixed to the drawer. The fixed portions "host" the cams, inasmuch as the cams fit into the holes of the fixed portions, but the cams are still part of the handle portion.

In the AP, as in the patent, the lever engages with the drawer slide to lock (prevent it from sliding out) or unlock (allow the drawer to slide easily open or shut) the drawer. Pulling on the AP's handle pivots the handle portion relative to the fixed portion, which causes at least one of the lever-engagers to press down on the lever of the drawer slide, which releases the latch or lock of the drawer slide. *See* (Docket #55-15 at 44:23–45:11). Thus, the AP directly infringes Claim 26 of the '331 Patent.

Allegis has not pointed to any evidence that would suggest a genuine dispute of material fact as to any of the above limitations. Its most robust arguments are rooted in the construction of the claim—in particular, what constitutes the "handle portion," and whether the term "lever-engaging member" covers more than simply the pin employed in one of Austin's embodiments. However, as discussed in Section 2, the Court has construed these terms in Austin's favor. Additionally, while Allegis belabors the differences between its product and an annotated embodiment of Austin's patent, an infringer cannot overcome a term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *CCS Fitness, Inc.*, 288 F.3d at 1366. The evidence as to whether each limitation has been met is overwhelmingly in Austin's favor.

### 3.2    Infringement on Claims 27–30

Claims 27–30 consist of limitations to Claim 26, and are dependent on the language in Claim 26. Specifically, Claim 27 requires "pulling on the handle portion to slide the drawer open, wherein the drawer slides open via the drawer-slide;"[3] Claim 28 requires "pulling on any portion of the handle portion to open the drawer;" Claim 29 requires "wherein the at least one lever engaging member comprises at least two lever engaging members and further causing the two lever engaging members to move substantially downward to engage the lever and an additional lever;" and Claim 30 requires "causing the at least one lever engaging member to move downward to engage the lever, while simultaneously causing a second lever engaging member to move downward to engage a second lever."

All of these limitations have been met by the AP, except for Claim 28. Per Claim 27, if the AP's handle is pulled, the drawer slides open via the drawer slide; per Claim 29, the AP has two lever-engaging members (i.e., two cams), one on either end of the handle; and per Claim 30, as one cam moves down to engage the lever on one side of the handle, the other cam moves down to engage the lever on the other side of the handle. But as for Claim 28, it is clear that if the handle caps and cams are part of the handle portion, then it is not possible to "pull on any portion of the handle portion to open the drawer," because some portions of the handle simply cannot be pulled. Accordingly, the Court finds infringement on Claims 27, 29, and 30, but not Claim 28.

---

[3]This is not necessarily a claiming error, as Allegis suggests; the Court reads: "the drawer slides [verb] open via the drawer-slide [noun]."

### 3.3 Direct Infringement of the '937 Patent, Claim 14

The Court's claim construction and discussion regarding Claim 26 has resolved most of the issues surrounding Claim 14. The primary elements still in dispute for Claim 14 of the '937 Patent are the sixth and seventh elements, i.e., whether "a spring assembly biases the handle portion to the closed portion," and whether the AP "comprise[s] . . . a drawer slide."

As to the sixth element, i.e., whether a spring assembly biases the handle portion closed, the evidence demonstrates that it does—and there is no evidence to the contrary. (Docket #55-15 at 44:6–22). Moreover, the Court has construed "spring assembly" to mean "a spring that assembles the handle portion closed," which the AP does. The fact that the AP does not include spring guides, a spring guide base, or a spring guide opening does not compel the finding that there is no infringement.

The Court also finds Allegis's argument as to the seventh element unavailing: while Allegis claims that its device does not *include* a drawer slide, there is no evidence in the record suggesting it can be used *without* a drawer slide—thus, as a practical matter, the device requires a drawer slide, and therefore comprises a drawer slide. Finally, Allegis contends that "a handle portion pivotally engaged to a fixed portion to move between open and closed positions" does not apply to the AP because Claim 14 requires the *handle itself* to open and close, rather than the *drawer* that it moves into an open and closed position. This is a needlessly tortured reading of the claim. The handle moves the drawer open. The handle moves the drawer closed. The handle, which is connected to the drawer, thus moves between open and closed positions. The AP does exactly this—when the handle is

moved open, it extends outward into space; when the handle is moved closed, it is flush along the edge of the drawer mouth.

### 3.4 Direct Infringement of the '937 Patent, Claim 21

Most of the contested elements in Claim 21 have been resolved via claim construction or the Court's analysis of Claims 26–30 of the '331 Patent or Claim 14 of the '937 Patent. In a final few efforts to avoid infringement, Allegis contends that Austin's analysis of the "fixed portion" of the AP contradicts with the claims that, per Allegis, require "'the handle portion' to have an *engaging member*." (Docket #69 at 28). According to Allegis, because the engaging member—while connected to the handle portion—runs through the fixed portion, it is located "in" the fixed portion, rather than "in" the handle portion, thereby precluding infringement. This is not particularly persuasive. The claim does not require the engaging member to be *in* the handle portion; it requires the engaging member to be *part of* the handle portion. For example, Claim 26 of the '331 Patent and Claim 21 of the '937 Patent each state, the "handle portion comprising . . .[an] engaging member." Claim 14 of the '937 Patent states, the engaging member "extends from the handle portion." As the handle portion is construed, this limitation is met.

Allegis also contends that the analysis of "the handle portion extends an entire width or substantially the entire width of the drawer" has not been properly constructed. This is not a claim that requires construction. *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012). The Court finds that the plain language of the limitation supports infringement. The Court also notes that the term's plain meaning gives support to the Court's determination that the handle portion includes the end caps that affix to the fixed portion (i.e., with the end caps, the handle portion "extends an entire

width or substantially the entire width of the drawer."). Consistent with the discussion above, the Court finds that the accused product meets the requirements of Claim 21.

### 3.5    Indirect Infringement of the '331 Patent and the '937 Patent

#### 3.5.1    Induced Infringement

"[T]here can be no inducement or contributory infringement without an underlying act of direct infringement." *In re Bill of Lading Transmission & Proc. Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012). However, once infringement has been established, 35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Unlike direct infringement, which is a strict liability offense, § 271(b) "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEV S.A.*, 563 U.S. 754, 766 (2011); *c.f. Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1922 (2015) (direct infringement is a "strict-liability offense in which a defendant's mental state is irrelevant.").

Thus, to establish induced infringement, the "patent holder must prove that once the defendants knew of the patent, they 'actively and *knowingly* aid[ed] and abet[ted] another's direct infringement.'" *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (citing *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988). "Evidence of active steps. . .taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *Metro-Goldwyn-Mayer Studios v. Grokster*, 545 U.S. 913, 936 (2005) (citations and quotations omitted) (applying patent infringement law in order to resolve a copyright infringement case).

Austin has already demonstrated that Allegis directly infringed the '331 and '937 Patents; now Austin must provide sufficient evidence to demonstrate that, upon learning of the patents, Allegis "actively and knowingly aided and abetted another's direct infringement." *DSU Med. Corp.*, 471 F.3d at 1305. Austin proffers the following evidence to demonstrate Allegis's knowledge of the '331 Patent: an email from May 27, 2015 indicating that Allegis was aware of the '331 Patent application; an email from Austin to Allegis on April 4, 2018 informing the latter of the '331 Patent; and an April 2019 cease-and-desist letter. *See* (Docket #83-7 at 91–93, 158). Austin also provides evidence that Allegis knew of the '937 Patent application in the summer of 2018, and of its approval in the fall of 2019. (*Id.* at 139–141).

Deposition testimony from Allegis's employees suggests that it was conscious that there was a risk of infringing the patents. *See* (Docket #83-7 at 44; Docket #55-15 at 163:7–22). This is not, however, evidence that Allegis actively and knowingly aided in infringing a patent by instructing others to infringe. To the contrary, there is deposition testimony from Allegis's patent attorney, Voigt, which makes clear that Allegis thoroughly conferred with him specifically to avoid infringement. (Docket #83-7 at 93–94). The record reflects that Allegis contacted Voigt several times and made design changes in order to avoid infringement. *Id.* This creates a genuine issue of material fact as to whether Allegis had the requisite intent to infringe. Therefore, the issue of whether Allegis induced infringement on the '331 and '937 Patents must be left for the jury to decide.

### 3.5.2    Contributory Infringement

35 U.S.C. § 271(c) explains that "[w]hoever offers to sell or sells within the United States or imports into the United States a component of a

patented machine . . .or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made . . . for use in an infringement of such patent . . . shall be liable as a contributory infringer." As with induced infringement, contributory infringement "requires knowledge of the patent in suit and knowledge of patent infringement." *Commil United States, LLC*, 135 S. Ct. at 1926. While there is evidence that Allegis knew of the '331 Patent and the '937 Patent, Allegis's demonstrated attempts to seek counsel from a patent attorney in order to avoid infringement, as well as Allegis's attempts to change its product to avoid infringement, raise a question of intent for the jury to answer. Therefore, Austin's motion for summary judgment on the issue of contributory negligence is denied.

### 4.    COUNTERCLAIMS AND DEFENSES

#### 4.1    Inequitable Conduct

Austin has also moved for summary judgment on certain of Allegis's defenses, including Allegis's claim of inequitable conduct. (Docket #53 at 60). To prevail on a defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the Patent and Trademark Office ("PTO"). *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). Both elements—intent and materiality—must be proven by clear and convincing evidence. *Id.* Moreover, the requisite intent is difficult to establish; even gross negligence does not qualify. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988). Rather, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it. *Therasense*, 649 F.3d at 1290. And

while the requisite intent may be inferred from circumstantial evidence, this is only permissible where the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). Further, the Court of Appeals has emphasized that "[i]ntent and materiality are separate requirements," so a weak showing of intent cannot be salvaged by a strong showing of materiality, or vice versa. *Therasense*, 649 F.3d at 1290. Even once the defendant establishes these elements, the district court must still weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable. *Star*, 537 F.3d at 1365.

The Court must also be mindful that the inequitable conduct defense is not well-taken by the Court of Appeals. Because of its far-reaching consequences, it has been called the "'atomic bomb' of patent law." *Therasense*, 649 F.3d at 1289 (quoting *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d 1334, 1349 (Fed. Cir. 2008) (Rader, J., dissenting)). It is a nearly universal feature of patent litigation, and has been derided as "an absolute plague," since "[r]eputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately[.]" *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988).

Allegis argues that Austin failed to disclose a material prior art—the Accuride 9308—to the PTO during the patent application process, thereby violating its duty of candor to the PTO. 37 C.F.R. 1.56(a). This omission would be material if the Accuride 9308 constituted new information about the prior art—i.e., if it was *not* cumulative of other information in the record. *Id.*

Allegis contends Austin's failure to provide any statement to the PTO about Accuride 9308 at some point during its lengthy and initially unsuccessful application process, particularly when Accuride 9308 had been available for years, suggests nefarious conduct. Allegis further intimates that the Accuride 9308 was a prior art that met all of the limitations. (Docket #69 at 40). But in making these arguments, Allegis fails to provide any evidence that Accuride 9308 was different from other "conventional lockin-lockout drawer slides," which Austin *did* disclose. Relatedly, Allegis provided no evidence that the Accuride 9308 actually did meet all of the limitations of the patent-in-suit, and was not simply a "conventional lockin-lockout drawer slide."

Against this factually anemic background, the Court cannot infer that a lengthy patent application process, absent more, gives rise to an intent to deceive the PTO. More to the point, no reasonable jury could reach such a conclusion on these facts. This says nothing of the materiality showing, which Allegis has entirely failed to make. Therefore, Austin will be granted summary judgment on this issue, and the defense of inequitable conduct will be dismissed.

### 4.2    Invalidity of Patents

An invalidity defense must be proved by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). In order to be valid, a patent must satisfy three requirements. First, the patent must conclude with claims "particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled

in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Second, a valid patent must have a sufficient written description, which demonstrates that the inventors "had possession of the claimed subject matter as of the filing date." *Ariad Pharma., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The focal point of the written description requirement is whether the inventor actually invented the invention claimed. *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562–63 (Fed. Cir. 1991). But because of the difficulty in reaching into the inventors' minds to learn what they knew, the test is instead "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad*, 598 F.3d at 1351. Evidence from outside the specification can be relevant, for "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*

Finally, a patent must be enabled, meaning that "the specification must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996) (citations and quotations omitted). Unlike the written description requirement, which requires a fulsome description of all elements of the claimed invention, the enablement requirement is less rigorous on the level of completeness required because it operates against the backdrop of the skilled artisan. That is, because a person of skill in the art already possesses substantial knowledge about the field, the disclosure need not explain the practice of the invention from scratch. *Falko–Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365

(Fed. Cir. 2006) ("[A] patent need not teach, and preferably omits, what is well known in the art.") (quotation omitted). To be sufficiently enabling, the disclosure need describe only what is new about the invention in sufficient detail so that one of skill in the art can combine the disclosure with the knowledge already known in the field and have enough information to practice the invention without undue experimentation. *See United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988).

### 4.2.1   Validity of the '331 Patent, Claims 26–30 — Indefinite

35 U.S.C. § 112(b) requires that a claim "particularly point[] out and distinctly claim[] the subject matter which the inventor . . .regards as the invention," be it, for example, an apparatus, or a method. Thus, a claim that recites "both an apparatus and a method of using that apparatus renders a claim indefinite under section 112[(2)]." *Ipxl Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) (finding that a claim for processing financial transactions was indefinite when it was not clear whether infringement would occur when a person "creates a system that allows the user to change the predicted transaction information or accept the displayed transaction, or whether infringement occurs when the user actually uses the input means to change transaction information"). While there is a presumption of a patent's validity, this presumption "does not alter the degree of clarity that § 112(2) demands from patent applicants." *Nautilus, Inc.*, 572 U.S. at 912 n.10.

This rule avoids a situation in which it is unclear when infringement occurs. *Id.* For example, in *Rembrandt Data Technologies, LP v. AOL, LLC*, the court determined that a claim for a data transmission instrument was indefinite where it "recite[d] apparatus elements" by way of various means, but concluded the claim with a method element, i.e., "transmitting the

trellis encoded frames," thereby "reciting both an apparatus and a method of using that apparatus." 641 F.3d 1331, 1339 (Fed. Cir. 2011) (citations and quotations omitted). It should be noted, however, that "[m]ethod claim preambles often recite the physical structures of a system in which the claimed method is practiced." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008). If the claim "is clearly limited to *practicing* the claimed method in a [specific physical structure]" then there is no ambiguity, and no invalidity. *Id.* In other words, an initial reference to the device that supports the method does not render the claim a mixed apparatus and method claim. Rather, indefiniteness arises if the claim recites "both an apparatus and a method for using that apparatus." *Rembrandt Data Techs.*, 641 F.3d at 1339.

The parties agree that the patents describe a method for opening a drawer. This is distinct from an apparatus claim, which "cover[s] what a device *is*, not what a device *does*." *Hewlitt-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis in original). Allegis argues that the Claims 26–30 are indefinite because the first step is an apparatus claim, while the following steps are methods claims. Specifically, Claim 26 professes to be "a method of opening a drawer, comprising:" (1) "*providing* a drawer release comprising a handle portion . . ." (an apparatus step); (2) "*pulling* on the handle portion to pivot the handle portion relative to the fixed portion" (a method step); (3) "*causing* the at least one lever engaging member to move generally downward to engage the lever of the drawer slide" (a method step); and (4) "*releasing* the latch or the lock on the drawer slide to unlatch. . ." (a method step). According to Allegis, the first step, "providing a drawer release . . ." is an improper apparatus step that renders the claim impermissibly mixed.

However, Austin argues convincingly that the language of Claim 26 echoes that in *Microprocessor*, where the court upheld a similar method claim that "recite[d] the physical structures of a system in which the claimed method is practiced." 520 F.3d at 1374. In *Microprocessor*, the court determined that the following claim was definite:

> A method of executing instructions in a pipelined processor comprising:
>
> a conditional execution decision logic pipeline stage and at least one instruction execution pipeline stage prior to said conditional execution decision logic pipeline stage [an apparatus step];
>
> at least one condition code; . . .
>
> [followed by other method steps].

*Id.* at 1370. The court broke the claim down as follows: "A method of executing instructions in a pipelined processor comprising: [structural limitations of the pipelined processor]; the method further comprising: [method steps implemented in the pipelined processor]." *Id*. at 1374.

Claim 26 can similarly be read as: "A method for opening a drawer, comprising: [structural limitations of the drawer release system] . . . [followed by method steps implemented in the drawer release system]." *See id.* While this type of phrasing is not ideal—indeed, the Court acknowledges that the first element may raise confusion—it does not rob the claim of clarity such that it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc.*, 572 U.S. at 901. Accordingly, summary judgment on the issue of definiteness will be granted to Austin.

### 4.2.2 Validity of the '937 Patent, Claim 14 – Nonsensical

Allegis takes issue with the fact that Claim 14 covers "[a] release for a drawer slide, comprising . . . a drawer slide." As Allegis points out, "comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) (citations and quotations omitted). Thus, Allegis argues, Austin's claim that the method for releasing a drawer slide requires a drawer slide is nonsensical and "akin to claiming, an automobile for use on the road, comprising: an automobile with 4 tires, . . .[and] a road." (Docket #79 at 13) (quotations omitted). Austin counters that of course the release for the drawer slide requires a drawer slide; otherwise, what would be the point of the drawer slide release?

This argument on nonsensicality invites nonsensical logic, and the Court will not delve too deep. It suffices to say that Austin's argument is the better one. While a car can be driven on all manner of terrain (whether advisable or not), Claim 14 covers a method of releasing drawer slides, which means that it can only do one thing, which is release drawer slides. Therefore, a drawer slide is a required part of the whole assembly, and the claim is not rendered nonsensical for its inclusion.

### 4.2.3 Validity of the '331 Patent – Obviousness

35 U.S.C. § 103 precludes patentability if "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." In making this inquiry, courts "must ask whether the improvement is more than the predictable use of prior art

elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). It may "be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art." *Id.* at 418. However, "a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the . . .PTO." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011).

Allegis contends that the '331 Patent is invalid as obvious because the PTO examiner "never applied the combination of Bousquet '278 [patent] in view of the Accuride 9308." (Docket #69 at 42). It similarly contends that the '937 Patent is invalid as obvious because the PTO examiner did not consider the "Bousquet '278 in view of Tsai '299, in further view of Accuride 9308." *Id.* at 48. Fatally, however, Allegis does not explain how—much less provide any evidence to support a finding that—the Accuride 9308 was different than the "conventional lockin-lockout drawer slides" that the PTO did have occasion to consider. What, specifically, about Accuride 9308— versus the other conventional lockin-lockout drawer slides—makes the DRS so obvious when taken in consideration with the other patents? Allegis has not even begun to meet its burden to provide clear and convincing evidence that the patents are obvious based on the prior art. The Court cannot find a genuine issue of material fact here, where the defendant relies solely on "the same prior art considered by the PTO." *Creative Compounds LLC v. Starmark Labs.*, 651 F.3d 1303, 1313 (Fed. Cir. 2011).

### 4.2.4   Other Affirmative Defenses

Austin seeks a sweeping summary judgment against Allegis's sixteen affirmative defenses. However, Austin only specifically named the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Twelfth, and Fourteenth affirmative defenses. (Docket #53 at 67–68). These defenses cover equitable intervening rights; failure to state a claim; invalidity; lack of evidence of direct infringement; lack of evidence of willful infringement, laches, good faith, and doctrine of implied license. Allegis did not oppose summary judgment on these defenses in its opposition to the motion for summary judgment. *See* (Docket #69).

The Court finds it appropriate to dismiss each of the affirmative defenses that Austin specifically listed that are both unopposed and uncontradicted by the terms of this Order. Thus, the Court will dismiss the First affirmative defense (equitable intervening rights); the Second and Third affirmative defenses (failure to state a claim); the Fourth affirmative defense (invalidity); the Fifth affirmative defense (no direct infringement); and the Seventh affirmative defense (laches). The Twelfth affirmative defense pertains to fees under 35 U.S.C. § 285 and there is some evidence in the record that Allegis did attempt to act in good faith; therefore, that defense will stand as to costs and fees only. Additionally, the Sixth affirmative defense, regarding willful infringement of the '331 Patent, will stand for the same reasons.  Finally, the Court notes that while Austin addresses the doctrine of implied licenses as part of the Fourteenth affirmative defense, the most recent answer does not include implied license as part of the Fourteenth affirmative defense. (Docket #53 at 68 n.9); *Compare* (Docket #43 at 9) *with* (Docket #35 at 8). The Court therefore sees no reason to rule on the implied license defense.

## 5. CONCLUSION

For the reasons explained above, the Court will deny Allegis's motion for summary judgment and grant in part Austin's motion for summary judgment. The Court finds that Allegis has directly infringed on the '331 and '937 Patents. The issues of whether Allegis indirectly infringed on the '331 and '937 Patents by way of induced infringement or contributory infringement—in other words, Counts Two, Three, Five, and Six—will be left for the jury to decide.

Accordingly,

**IT IS ORDERED** that Defendant Allegis Corporation's motion for summary judgment (Docket #44) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff Austin Hardware & Supply Inc.'s motion for summary judgment (Docket #50) be and the same is hereby **GRANTED in part**;

**IT IS FURTHER ORDERED** that the parties' motions to restrict documents (Docket #51, #62, #82, #84, #94) be and the same are hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Plaintiff Austin Hardware & Supply Inc.'s motion to strike (Docket #93) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2020.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge